ORDERED UNSEALED on 07/30/2026   s/ melodyqui

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 26MJ4495 |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF** |
| v. | Title 18, United States Code, Section 1958(a) – Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire |
| MARCOS ARTURO KLEIMAN TRONLLAN, | |
| Defendant. | |

The undersigned complainant being duly sworn states:

Beginning on a date unknown, but at least since on or about March 10, 2026, and continuing through on or about July 29, 2026, within the Southern District of California and elsewhere, defendant MARCOS ARTURO KLEIMAN TRONLLAN did knowingly use and cause another to use a facility of interstate and foreign commerce, including, specifically, cellular telephones and the Internet, with the intent that the murder of Individual 1 be committed in violation of the laws of the United States and the State of California as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value, to wit, United States currency and a cryptocurrency known as USDT (Tether). All in violation of Title 18, United States Code, Section 1958(a). The complainant states that this complaint is based on the attached Statement of Probable Cause incorporated herein by reference.

_Andres salazar_
Andres Salazar, Special Agent
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 29th day of July, 2026.

HON. DANIEL E. BUTCHER
UNITED STATES MAGISTRATE JUDGE

## STATEMENT OF PROBABLE CAUSE

I, Special Agent Andres Salazar, declare under penalty of perjury that the following is true and correct to the best of my knowledge.

### I.    Affiant's Training and Experience

1.    I am a Special Agent with Homeland Security Investigations (HSI). I am currently assigned to the HSI Office of the Assistant Special Agent in Charge in El Centro, California and am a member of HSI's Costa Pacifico Money Laundering and Financial Crimes Task Force.

2.    I graduated from the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia in December 2022. At FLETC, my training included a wide range of subject areas such as narcotics trafficking, money laundering, and firearms trafficking among others. Since graduating, I have participated in and conducted investigations of violations of various state and federal criminal laws, including unlawful possession with intent to distribute controlled substances, distribution of controlled substances, use of communication facilities to commit narcotics offenses, importation of controlled substances, conspiracy to import, possess and distribute controlled substances. These investigations resulted in arrests of individuals who imported, smuggled, received, and distributed controlled substances, including cocaine, heroin, methamphetamine, and marijuana. These investigations also resulted in arrests of individuals involved in smuggling bulk U.S. currency from the United States to Mexico and from Mexico into the United States. Through these investigations, my experience, and training, as well as discussing the methods and practices of narcotics traffickers with numerous law enforcement officers and confidential sources, I have become familiar with the operations of drug trafficking organizations in the United States and Mexico.

3.    I have participated in undercover and confidential source buy operations, telephone toll analysis, records research, physical and electronic surveillance activities, and wiretap investigations. I have used telephone records and bills, financial records, drug ledgers, photographs, and other documents to identify drug trafficking organization (DTO)

co-conspirators. I have also participated in debriefings of many individuals who were arrested and later cooperated with law enforcement. I have been involved in numerous investigations in which court-authorized wire or electronic interceptions were utilized to further the investigation. My involvement has included assisting with surveillance, monitoring intercepted communications, and preparing reports of my observations.

4. Since I became involved with investigations of organized criminal groups, I have participated in numerous narcotics and money laundering, and Transnational Criminal Organizations (TCO) related investigations. Many of these investigations involved the use of wire intercepts and other electronic surveillance techniques. During those investigations, I have used all the traditional investigative techniques, including participating in interviews of drug traffickers and money launderers, searches of residences and vehicles for evidence of drug trafficking, bulk cash smuggling and money laundering, surveillance operations, and operations involving confidential human sources. Additionally, I have participated in, organized, and run undercover operations including controlled narcotics purchases and controlled bulk cash pick-ups of narcotics proceeds. Based on my training and experience, I am knowledgeable in the tactics and methods used by drug traffickers to facilitate their criminal activities.

5. Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar, with the methods utilized by narcotics trafficking organizations, as well as the methods and means used to control narcotics trafficking and the flow of bulk cash narcotics proceeds. Additionally, I have knowledge of the methods used by TCOs to facilitate the movement of bulk cash narcotics proceeds back to Mexico by utilizing organized bulk cash smuggling operations, the United States financial system, and shell corporations. I am also aware that laundering of bulk currency may involve the use of "funnel" accounts, bank accounts utilized by money launderers to structure bulk currency deposits below the $10,000 threshold that triggers the filing of a Currency Transaction Report (CTR).

6.    I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and audio recorded conversations. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert an event took place on a particular date and time, I am asserting that it took place on or about the date and time alleged. Where statements of others are related herein, they are related in substance and part.

## II.    Investigators Identify KLEIMAN as a Suspected Money Launderer

7.    KLEIMAN is a citizen of Mexico and resides around Miami, Florida as a lawful permanent resident.

8.    KLEIMAN previously owned and operated a licensed money service business known as MXN Financial LLC which was an international wholesale currency dealer and currency exchanger operating within the Southern District of California. In 2025, MXN Financial LLC changed its name to MoneyFlip LLC, where KLEIMAN remains the Chief Executive Officer. Investigators suspected that KLEIMAN used his business to engage in cross-border currency transactions that evaded Bank Secrecy Act filing requirements and to launder illicit proceeds from drug sales that were further placed and layered into the financial system through money service businesses near the U.S-Mexico border.

9.    On or about April 25, 2024, Confidential Source-6 (CS-6[1]) made an outgoing call to KLEIMAN, which was consensually monitored and recorded by agents.[2] While

---

[1] CS-6 began cooperating with investigators in September 2023 after being detained on suspicion of attempting to smuggle close to $10,000 USD without declaring it to U.S. Customs. Since that time, CS-6 has provided historical context about illicit Mexicali and Tijuana Baja, California financial organizations that he understood due to existing business and personal connections. The information CS-6 has provided has, where possible, been independently corroborated and is believed to be reliable. To present, HSI has not paid CS-6 for providing information and believes CS-6 is providing information to maintain a good rapport with law enforcement. CS-6 has no known criminal history in the United States.
[2] Unless otherwise noted, all conversations were in Spanish and have been translated into English by an interpreter.

discussing an opportunity for them to work together in bulk cash transactions, CS-6 and KLEIMAN engaged in the following dialogue at the end of this phone call:

| CS-6 | Okay, when you are around here, call me and we can meet somewhere and talk. What do you think? |
|---|---|
| KLEIMAN | Alright, done. |
| CS-6 | But really because um, sometimes I get stuck [With lots of cash] and I have to retail. And it's fucking hard to retail. It's a risk to retail. It's better to take it all out in one fucking blow, right? |
| KLEIMAN | No, no, send… send me a WhatsApp right now. |
| CS-6 | Yes. |
| KLEIMAN | Um… and I'll look around and see where I can place it because what… what… what is all clean, is all clean [agents recognize as slang for legal]. And what's kind of dirty [agents recognize as slang for illegal], has to be placed in other places. |

*The conversation ends with both agreeing to communicate soon.*

10.    Based on my training and experience, KLEIMAN's statements indicate he was comfortable conducting financial transactions that were "dirty" and knew how to handle them differently from transactions that were "clean." In addition, immediately prior to making this statement KLEIMAN asked CS-6 to communicate with him by WhatsApp for the third time in the conversation. Investigators believe that KLEIMAN made the repeated request to communicate by WhatsApp because the application encrypts messages and he may have wanted to discuss illicit transactions.

### III.    KLEIMAN Launders Money Represented to be Proceeds of Drug Trafficking

### A. <u>KLEIMAN Meets with Undercover Agents and Agrees to Launder Drug Proceeds for a Fee</u>

11.    On or about February 18, 2026, an HSI Special Agent authorized to engage in undercover activity (UCA-1) made an introductory and recorded phone call to KLEIMAN who investigators believe was in Florida. The purpose of the phone call was to ask KLEIMAN if he would convert cash belonging to UCA-1 into cryptocurrency and send the digital currency to UCA-1 for a fee. During this phone call, KLEIMAN stated that he could move "dirty" money. Specifically, he said "Give me the major details. I need to know

4

if . . . if what you have is clean or if it's dirty. I mean, I don't get scared, dude, but . . . I do need to know so . . . so I can see if I can help you and where to do it."

12.    During the same conversation, KLEIMAN made another statement as follows: "How I can help you with that…because at the end of the day…look…uhm…uhm…the water comes dirty, dude." KLEIMAN then said he would look into it and let UCA-1 know what he could do. They later arranged to have an in-person meeting in Miami.

13.    On or about March 3, 2026, UCA-1 called KLEIMAN to follow up on their discussion regarding the cash-to-cryptocurrency transaction. During that call KLEIMAN stated that his "service" to transmit UCA-1's money was "ten percent" of the amount transmitted and that KLEIMAN could "only receive big ones nothing small," which I believe means he would only transmit large amounts of money. By the end of the call, UCA-1 and KLEIMAN agreed to meet in person to discuss the details of their money transmission.

14.    On or about March 10, 2026, UCA-1 and two other HSI Special Agents in an undercover capacity—UCA-2 and UCA-3—met KLEIMAN at a restaurant in North Miami, Florida. These UCAs wore and possessed devices that audio recorded this meeting and the subsequent conversations with KLEIMAN. After initial greetings, UCA-1 brought up the topic of Chinese money launderers undercutting everyone. At one point, UCA-1 complained to KLEIMAN that Chinese money launderers wanted "to give you five (5) of ten (10). Go to hell!" KLEIMAN responded "No, I don't do that bullshit."

15.    Based on my training and experience, the reference of "five of ten" translated from Spanish for "De 5 y de 10," is a reference to street money from street drug sales that are denominated as five-dollar and ten-dollar U.S. bills. I believe KLEIMAN's immediate response of "No, I don't do that bullshit," indicated KLEIMAN understood the reference and that he understood UCA-1 was there to discuss laundering higher volumes of money derived from drug sales.

16.     The group also discussed in general terms the challenges of laundering money in the present political climate. KLEIMAN told the agents, "Forget about ten, fifteen, or twenty years from now, things have totally changed. From five years ago, things have changed a lot." When asked what has changed, KLEIMAN responded, "I feel that the government in Mexico, the previous one, well, well, it did make a big deal about it and shit, but 'Go ahead.' And the current government is so pressured by this one that they are making things happen.  No, they are not letting certain things go through, they are putting more [pressure] on both sides."

17.     While discussing this business venture, KLEIMAN explained, "So the whole situation is very complicated, especially the financial aspect.  What I was doing in San Diego was, I had to… I was supplying the exchange centers; all the money exchange houses in San Ysidro [California]…I supplied them pesos." KLEIMAN continued, "I was like the wholesale… So then, I would supply all the pesos. For, for a while now they started arresting people in the street, man. 'No, you exchanged over here and exchanged over there and exchanged…I mean… they did that bullshit.  They did a strong taskforce HSI, DEA, FBI.'"

18.     Later in the conversation, KLEIMAN instructed UCA-1 that their communications about the bulk currency exchanges and crypto-currency transactions would occur through Proton Mail email, which is an encrypted email service. KLEIMAN explained that they would not send emails using Proton Mail, but rather draft an email and save it without sending it so no email traffic existed. Once KLEIMAN or UCA-1 drafted and saved an email, they would send each other a message on the cell phone based encrypted text message application known as Signal to indicate that a Proton draft message was available to read.

19.     KLEIMAN explained: "I will tell you how we'll do it so we can all be careful… The laws in this country are tough."  "I will give you an email, you will log into the email and we will uhm, literally leave the draft…Yes one you finish the operation and your erase the…[message].  "There's no communication. There's no: 'Man, I'm over here,

I'm over there.' I mean, none of that. Yes, obviously we will need to communicate through email, obviously." KLEIMAN continued: "Attach the… the wallet [cryptocurrency wallet]." "I mean, we'll get to it. Uh, the email is, I created it yesterday, literally. So, uh, I'll give you the password, you log in, bum-bum-bum, uh, you send me a message, 'Check.' And I'll know what to do…. And that's how we are going to communicate. I mean, that's how it is because that way, there are not two-way messages. You didn't send me, I didn't send you."

20.    KLEIMAN emphasized using coded language for currency, and specifically used the word "avocados" as a code for currency—both of which are notably green in color. During this meeting, KLEIMAN showed UCA-1 a Proton Mail email account he had already created for them and gave UCA-1 its 22-character pass phrase.

21.    By the end of the restaurant conversation, KLEIMAN agreed to launder approximately $250,000 for a 10% commission fee. In return, UCA-1 would receive the amount of laundered funds, minus, the 10% fee, in cryptocurrency.

22.    These exchanges are probative that KLEIMAN understood the source of UCA-1's money was from the distribution of controlled substances.

### B. KLEIMAN Launders Undercover Agent's Money for a Fee

23.    On March 18, 2026, UCA-3 drove a vehicle to KLEIMAN's residence located on Williams Island, 6000 Island Boulevard, Aventura, Florida, which is located near Miami, Florida. The residence was a high-rise condominium structure with underground parking. The purpose of this meeting was to deliver $275,000 in currency to KLEIMAN so that he could launder the currency and transfer it to UCA-1's cryptocurrency wallet.

24.    At the time, UCA-3 possessed approximately $275,000 in United States dollars—constituting the $250,000 that KLEIMAN agreed to launder for UCA-1 and KLEIMAN's 10 percent fee of $25,000. During the meeting, KLEIMAN directed UCA-3 to a secure parking area inside the condominium's residential area. KLEIMAN approached UCA-3's vehicle holding a black duffel bag and got into the front passenger seat. The conversation between KLEIMAN and UCA-3 was recorded.

25. When KLEIMAN entered the car, UCA-3 said, "here is the paper for the . . . this is yours" and contemporaneously handed KLEIMAN a piece of paper with the cryptocurrency wallet address. KLEIMAN then transferred the $275,000 of cash from UCA-3's black duffel bag into KLEIMAN's duffel bag (which he brought with him). After the transfer, KLEIMAN exited the vehicle and UCA-3 drove away.

26. On March 20, 2026, KLEIMAN sent three different transfers to UCA-1's cryptocurrency wallet: one for 10.00 USDT, one for 100,000 USDT and one for 150,000 USDT. USDT is a stable cryptocurrency pegged to the United States dollars and is also known as Tether. The undercover cryptocurrency wallet that received the USDT transfers from KLEIMAN was in the Southern District of California. Based on my training and experience, these transfers are consistent with laundering transactions, specifically including laundering of bulk cash.

27. On or about April 21, 2026, KLEIMAN and UCA-1 met at Graziano's Mercado Aventura, located at 2920 NE 207th Street, Unit 107, in Aventura, Florida. During this meeting, KLEIMAN told UCA-1 that UCA-1 would need to wait to drop off the next shipment of $275,000 because KLEIMAN's "guy" was not in town. Specifically, KLEIMAN told UCA-1, "Because…to start that dude gets here until Wednesday night, I believe, some shit like that. And the truth, where we saw each other, there's a lot of eyes, a lot of eyes."

28. During this meeting, UCA-1 and KLEIMAN also discussed arranging to have UCA-1 deliver bulk currency to KLEIMAN in Mexico City, and KLEIMAN said the other party involved in the transaction would be his uncle.

29. On April 30, 2026, a little after 10:15 a.m., UCA-3 picked up KLEIMAN near his residence and KLEIMAN got into the rear passenger-side seat of UCA-3's vehicle. Their conversation inside the car was recorded.

30. UCA-3 told KLEIMAN he got confused about where to go and KLEIMAN said "It's because there are no cameras here." During the conversation, KLEIMAN made other comments about the presence of cameras around the area that appeared to indicate

8

his concern about his meeting with UCA-3 being recorded. During this meeting, UCA-3 delivered $275,000 in United States Dollars to KLEIMAN, which constituted the $250,000 to be laundered for UCA-1 and KLEIMAN's 10 percent $25,000 fee.

31.    On May 3, 2026, KLEIMAN sent two different transfers to the undercover cryptocurrency wallet located in the Southern District of California; one for 249,990 USDT and one for 10.00 USDT.

32.    On July 23, 2026, KLEIMAN met UCA-1, UCA-3, and another undercover agent, UCA-4, in the Interlomas neighborhood of Mexico City, Mexico. UCA-4 was introduced to KLEIMAN as a Mexico-based courier who would deliver bulk cash to KLEIMAN in Mexico for any future transactions.

33.    At approximately 1:00 p.m., the group of undercover agents met KLEIMAN in an office building and KLEIMAN escorted the group to an office upstairs. During the meeting, KLEIMAN introduced the undercover agents to a person identified as his uncle. When the undercover agents delivered $275,000 USD to KLEIMAN, his uncle took out the money and began counting it.

34.    At some point, KLEIMAN and the undercover agents separated from KLEIMAN's uncle and KLEIMAN began to discuss the scope of his international money laundering operation. KLEIMAN told the undercover agents that he has multiple Mexico-based shell companies that he uses to move money for a network of customers. KLEIMAN also said it was easier for him to move large amounts of cash through the office location in Mexico City than it was in the United States.

35.    KLEIMAN and UCA-1 discussed how KLEIMAN would send the $250,000 that had just been delivered back to UCA-1. UCA-1 discussed having a portion of it sent to a bank account under fictitious business name that suggested the account was for a business involved in investments or financial services. KLEIMAN commented that he only wanted to send money between two shell companies that were "aligned." In other words, KLEIMAN did not want to have a fictitious textile company sending money transfers to a fictitious investment company because those two companies are not in the same type of

9

business. For example, KLEIMAN wanted to have the transfers occur between two fictitious textile companies because they were in the same kind of business.

36.     At the conclusion of this meeting, UCA-1 and KLEIMAN made plans to meet in the Miami area again on or around July 28, 2026.

### IV.   KLEIMAN Hires Undercover Federal Agent to Commit Murder

### A. KLEIMAN Initiates Conversation to Murder Individual 1[3]

37.     During the same March 10, 2026, restaurant meeting in North Miami, Florida between the undercover agents and KLEIMAN (discussed earlier in this affidavit), the conversation between UCA-1 and KLEIMAN turned to the topic of trust. KLEIMAN explained, "The truth is I'm very private and very, very careful with my stuff." Following this statement, a waiter approached the group to take drink orders, but KLEIMAN declined an alcoholic drink and UCA-1 said "Why? For, for being . . .? Really, man?" UCA-1 and KLEIMAN then had the following exchange:

| Speaker | Translation |
| --- | --- |
| **KLEIMAN** | **For trusting people, brother.** |
| UCA-1 | Oh really? |
| **KLEIMAN** | **Later on, we'll see how you can help me with this matter. Uhm…** |
| UCA-1 | Hey, in other words, they… they got you drunk to do something and they made you… I mean, they took advantage of you because you were drunk? |
| **KLEIMAN** | **[U/I] dude, and that, that we were going to do things together.** |
| UCA-1 | Uh-huh. |
| **KLEIMAN** | **So, I sent him money and all that and right away. And then, I found him, they caught him, he… he got away, they caught him again.  He's-he's being protected.** |
| UCA-1 | Yes, later on, if, if we, if we build trust we will talk about it, no problem. |

38.     At the conclusion of the Lique Miami Restaurant meeting, UCA-1 walked KLEIMAN outside and UCA-1 asked if KLEIMAN could reduce the commission by "two

---

[3] For the purpose of protecting the victim's identity, we are only identifying this victim as "Individual 1" in the Complaint.

10

or three points." Following this question, UCA-1 and KLEIMAN engaged in the following conversation:

| Speaker | Translation |
|---|---|
| **KLEIMAN** | I can't, I can't. I can't do anything at the moment. We can talk about it later. |
| UCA-1 | Alright. |
| **KLEIMAN** | I can't right now, with those dudes, we have to build that thing. **And well, maybe you can give me a hand with the other issue. You can make a lot of money.** |
| UCA-1 | Oh yeah. Yes, yes. About that, yes, if you want … we can make some time. I need to go back for two (2) or three (3) weeks [U/I] I might have to come back here. We can look for a place and talk about it. |
| **KLEIMAN** | **Oh, I'll even send, I'll even send that to you through message, I don't give a fuck.** |
| UCA-1 | Well, put it, put it in there for me. I know a lot of people talk and talk. If you tell me exactly what it is, what happened and then I can tell you: "Yeah," or "No." |
| **KLEIMAN** | **What happened is that this dude was introduced to me by a friend.** |
| UCA-1 | Uh-huh |
| **KLEIMAN** | **A friend introduced him to me, and the guy tells me, "We should do business," and shit and I don't know what else. So, I sent him money. Money, I sent him around fifty (50), sixty (60) sticks [millions of pesos], around that.** |
| UCA-1 | Okay |
| **KLEIMAN** | **And he screwed, man. I mean, he screwed me, man. Then, he started making up bullshit: "No, I got robbed," and shit. Bullshit, you know, right?** |

39.     KLEIMAN continued to tell UCA-1 how this person in Mexico stole millions of Pesos from him, describing him as a "son of a bitch" and "this fucker." Eventually, KLEIMAN told UCA-1 that this person's name was Individual 1 and proceeded to show UCA-1 various photographs of Individual 1.

40.     UCA-1 asked KLEIMAN whether he would "like to speak with" Individual 1, and KLEIMAN responded, **"Fuck no! I want him to pay me. If he doesn't pay me . . ."** *and then KLEIMAN gestured with his hand across his neck to indicate he wanted Individual 1 killed.* UCA-1 replied, "Fucking get rid of him and that's it. Easy." KLEIMAN answered, **"That's it. I don't even need to tell you."**

**B.  KLEIMAN Furthers His Plan to Collect from and Kill Individual 1**

41.     On or about March 19, 2026, UCA-1 and UCA-3 met KLEIMAN in person in Miami, Florida. The UCAs wore and possessed devices that audio and visually recorded this meeting and the subsequent conversations with KLEIMAN. During this meeting,

KLEIMAN reiterated his motive to have Individual 1 murdered. KLEIMAN explained that Individual 1 approached KLEIMAN and others to invest in some type of oil scheme in which KLEIMAN and others invested approximately $50 million pesos and only received approximately $5 million pesos back. KLEIMAN stated that he believed Individual 1 owed him more than $130 million pesos when including interest, and that KLEIMAN was responsible for paying others due to this lost investment.

42.    KLEIMAN and UCA-1 continued to discuss capturing Individual 1 to make him pay KLEIMAN back. In one exchange, KLEIMAN stated, "That is the issue [to get paid back]. If he pays man, he paid and that's it. Let's make things clear."

43.    UCA-1 responded, "Okay. So then, uhm… That's what I am telling you. And if he does not pay? If he, if he doesn't want to pay, what, what do we do, man? Because for me to get him and then release him again…." And UCA-3 immediately said "It won't be possible [to release Individual 1] anymore." KLEIMAN replied, "Yes, yes, yes" indicating he understood that Individual 1 could not be released from the kidnapping whether or not he paid KLEIMAN.

44.    In another exchange, UCA-3 told KLEIMAN "Well, the thing is like you said, I mean, the problem will be in, in, in him [Individual 1] saying: 'You know what? I don't give a fuck. I'm not going to pay.' So, there won't be, I mean, it is what is it right? I mean, it will get done and there is no turning back and a resource [meaning the assassination team] will need to be paid for. That's what we are seeing." KLEIMAN responded, "That's why, again, tell me the cost of the things, man, transparency, man. 'Yes, yes. No, no.'" The meeting concluded with UCA-1 agreeing to obtain prices for what KLEIMAN wanted done related to Individual 1.

45.    On April 21, 2026, UCA-1 and UCA-3 met KLEIMAN in Miami, Florida. The UCAs wore and possessed devices that audio and visually recorded this meeting and the subsequent conversations with KLEIMAN. Speaking about Individual 1, KLEIMAN said "what is the plan, what is up?" UCA-1 explained the plan to kidnap, collect money from Individual 1, and then kill him. UCA-1 stated "it's picking him up, making him pay,

and kill him. But we need to kill him over here [in the United States], we cannot take him out. Because if you release him here, he'll go running to the police." UCA-1 also explained to KLEIMAN the kill team was charging $40,000 to kill Individual 1 and they wanted a deposit of money. KLEIMAIN responded, "Yes, of course" and "They know what's up."

46.    Also on April 21, 2026, KLEIMAN and UCA-1 discussed whether to leave Individual 1's body to be found or to "disappear him." While discussing disappearing him, UCA-1 stated "or simply, the dude disappears, disappears and that's it, fuck it. They don't find him and the investigation stays open, sure, but if they never find him, they never fucking found him. . . And mean while they [law enforcement] move on that over there . . . in other words, the dude will never show up again." KLEIMAN responded "Yeah, no splash back, dude, nothing." Later in the conversation, UCA-1 said "we can also make that dude disappear" KLEIMAN nods his head affirmatively, UCA-1 says "We fucking get rid of him" and KLEIMAN responded "Yes, then there is nothing, there is nothing there."

47.    KLEIMAN also asked the UCAs whether they thought Individual 1 would pay the money. UCA-3 gestured to UCA-1 and said "I told this dude that he not going to fucking pay." KLEIMAN laughed and said "yeah, I think the same thing fucker," thereby indicating KLEIMAN did not believe Individual 1 would pay him back.

### C. KLEIMAN Arranged Payment to Reserve the Kill Team

48.    On or about April 23, 2026, UCA-1 used his cell phone in San Diego, California to leave a draft email in the Proton Mail email account KLEIMAN created. UCA-1 wrote "Here is what you asked for, they just sent it to me . . . $40,000 dollars to kill the fucker for being a thief. I asked if 5,000 is enough to make the reservation for the topic we discussed and later the other 5." That same day KLEIMAN responded in a draft Proton email "Just let me know if the 5 and 5 and if they deliver. Mexico City or what? Is there a minimum charge?" That same day UCA-1 replied in a draft email "You give me the 5 and 5 here in San Diego and my people will pay over there for us so you and I have some distance, well, to be safe. The complete deposit/minimum is the 10 when the rest is

paid once the job is done." KLEIMAN wrote "As soon as I get back what I told you, I will let you know about the 5 and 5."

49. Below are screenshots of these messages and their translations:





| SCREENSHOT | TRANSLATION |
|---|---|
| | **7:01**<br><br>(No subject)<br><br>From:<br><br>[redacted]@proton.me<br><br>To:<br><br>(No subject)<br><br>**KLEIMAN:** Just let me know if the 5 and 5 and if they deliver.<br><br>Mexico City or what?<br><br>Is there a minimum charge?<br><br>****<br><br>**UC137:** You give me the 5 and 5 here in San Diego and my people will pay over there for us so you and I have some distance, well, to be safe.<br><br>The complete deposit/ minimum is the 10 when the rest is paid once the job is done. |

50.    In between the exchanges of these draft Proton Mail messages, KLEIMAN and UCA-1 used the Signal text message application on their cell phones to inform each other that draft Proton Mail messages about the payment plan to murder Individual 1 were waiting to be read. On April 23, 2026, when UCA-1 sent Signal messages from his cell phone about this topic, UCA-1 was in the Southern District of California.

//

//

//

//

//

//

//

//

//

15

51.    Below is a screenshot and translation of these Signal cell phone messages where KLEIMAN and UCA-1 tell each other to check the draft email messages:

| SPEAKER | TRANSLATION | TIME |
|---|---|---|
| | Thu, Apr 23 | |
| UC137: | Note. [NOTE] Go ahead/ | 6:47 PM |
| KLEIMAN: | Take a look. | 6:52 PM |
| UC137: | There's a document. | 6:52 PM |
| UC137: | Did you see it? | 6:52 PM |
| KLEIMAN: | Yes, I saw it. | 6:52 PM |
| UC137: | [THUMBS UP] | |
| UC137: | Note. [NOTE] | 7:03 PM |
| UC137: | I'm going out for a bit. Take a look, because I'm leaving this phone behind. | 7:04 PM |
| KLEIMAN: | Take a look. | 7:04 PM |
| KLEIMAN: | It's all set. | 7:04 PM |
| UC137: | [THUMBS UP] | |
| UC137: | Alright. | 7:05 PM |
| UC137: | Good night, brother. | 7: 05 PM |
| KLEIMAN: | Same. | 7:05 PM |
| UC137: | I'm going to eat some tacos. | 7:05 PM |

52.    In early May 2026, KLEIMAN and UCA-1 made plans for KLEIMAN to pay $5,000 to reserve the kill team. On or about May 11, 2026, in a draft Proton Mail email message KLEIMAN provided UCA-1 with a phone number belonging to KLEIMAN's business partner who would give UCA-1 the $5,000. In a draft Proton Mail email, KLEIMAN wrote "He only knows I owe you money so do not mention anything else," meaning KLEIMAN did not want UCA-1 to communicate that the $5,000 was to reserve people to murder Individual 1. That same day, UCA-1 used his cell phone to call KLEIMAN's business partner to arrangement a meeting.

16

53. On or about May 14, 2026, UCA-1 met with KLEIMAN's business partner in the Southern District of California. During that meeting, KLEIMAN's business partner gave UCA-1 $5,000 cash. Before the meeting ended, UCA-1 used his cell phone to call KLEIMAN's cell phone. KLEIMAN answered on his cell phone and UCA-1 said "Hey, just to let you know that I'm here with your buddy. It's done, just so you know. Everything is good." KLEIMAN responded "Oh, great, fucking great. Thank you."

54. On July 1, 2026, UCA-1 used his cell phone to write a draft email in the Proton Mail account created by KLEIMAN. He wrote "[Individual 1] has a trip planned, from the U.S. to Mexico the first week of August. Maybe you can have the other 5k before that so I can reserve the savages. The plan is to pick him up on that trip. Once they pick him up, he will be given two or three days to pay everything possible. Remember that whether he pays or not he will be left dead on the side of the road with an announcement." KLEIMAN responded in a draft Proton email "I will get those 5 ready for you in 2-3 weeks."

55. On or about July 23, 2026, UCA-1 and UCA-3 met with KLEIMAN in Mexico City. During that meeting, KLEIMAN handed UCA-1 another $5,000 in United States currency to complete the deposit for the murder of Individual 1.

56. During this July 23, 2026, Mexico City meeting, KLEIMAN also asked "So, what's up?" about Individual 1. UCA-1 and UCA-3 told KLEIMAN their people were prepared to take Individual 1 in the next few days, collect payment from him, and then kill him. UCA-1 stated "But yeah, dude. That's the issue, like, once we pick him up, like you said, man, there's no more of, 'we're going to let him go, or [U/I].' That dude is fucked." KLEIMAN responded "I already, I already told you, to me . . . I just need to collect, if after that, what happened, happened . . . He went and messed with the people that he shouldn't have, that's his problem, oh well."

## V.    KLEIMAN Learns of Individual 1's Murder

57. On or about July 28, 2026, UCA-1 and UCA-3 met with KLEIMAN in Miami, Florida. The undercover agents wore and possessed devices that audio and video recorded the meeting. During that meeting, the undercover agents told KLEIMAN that Individual 1

17

had been captured and paid approximately $1.9 million United States dollars. The undercover agents also showed KLEIMAN three photographs and one video purporting to show Individual 1 captured, tortured, and killed. One of the photos showed Individual 1 sitting in and tied to a chair with blood coming from Individual 1's head appearing to show Individual 1 dead. The final photograph depicted Individual 1 laying dead in a field with a banner covering his body with the Spanish phrase "Por ser Rata," which translates to "For being a thief." Below is a true and accurate copy of the final photograph shown to KLEIMAN, with a redaction covering Individual 1's face.



58.     UCA-3 also confirmed to KLEIMAN that Individual 1 was dead, stating "they already killed the guy, so, those people need to get paid." KLEIMAN responded, "Okay.

Count on . . . count on it." KLEIMAN also referred to Individual 1 by stating "So, this asshole was going to turn me in."

59.     During this July 28, 2026 meeting, the undercover agents asked KLEIMAN to make the remainder of the payment for Individual 1's murder. KLEIMAN said he might be able to make a partial payment of approximately $5,000 within one or two days.

60.     On July 29, 2026, the undercover agents met KLEIMAN in Miami, Florida where he paid them another $5,000 in United States currency for Individual 1's murder. On the date, KLEIMAN also transmitted approximately 25,000 USDT into the undercover cryptocurrency wallet as a final payment for Individual 1's murder.

61.     Based on my training and experience and the foregoing, I believe there is probable cause that KLEIMAN used and caused others to use facilities of interstate and foreign commerce, including, specifically, cellular telephones and the Internet, with the intent that the murder of Individual 1 be committed in violation of United States and California laws as consideration for the receipt of United States currency and USDT cryptocurrency.